# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **MICHELLE K. M.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | Civil Action No.  3:17-CV-3044-BH |
| | § | |
| **NANCY A. BERRYHILL, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION AND ORDER

By consent of the parties and the order of transfer dated January 29, 2018 (doc. 16), this case has been transferred for the conduct of all further proceedings and the entry of judgment.  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for further administrative proceedings.

## I.  BACKGROUND

Michelle K. M. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claims for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), and for supplemental security income (SSI) under Title XVI of the Act.  (*See* docs. 1; 18.)

### A.  Procedural History

On December 19, 2014, Plaintiff filed her applications for DIB and SSI, alleging disability beginning on October 24, 2014.  (doc. 14-1 at 84.)[1]  Her claims were denied initially on May 8,

---

[1] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

2015, and upon reconsideration on July 22, 2015. (*Id*. at 84, 110.) On July 29, 2015, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*Id*. at 132.) She appeared and testified at a hearing on July 6, 2016. (*Id*. at 33-61.) On October 6, 2016, the ALJ issued a decision finding her not disabled and denying her claims for benefits. (*Id*. at 17-27.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on October 17, 2016. (*Id*. at 179.) The Appeals Council denied her request for review on September 11, 2017, making the ALJ's decision the final decision of the Commissioner. (*Id*. at 5.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

**B.    Factual History**

**1.    Age, Education, and Work Experience**

Plaintiff was born on July 14, 1974, and was 41 years old at the time of the hearing. (doc. 14-1 at 25, 38.) She had at least a high school education and could communicate in English. (*Id*. at 25.) She had past relevant work experience as a medical assistant. (*Id*. at 25.)

**2.    Medical Evidence**

On July 8, 2014, Plaintiff had x-rays performed on her hips, lumbar spine, right hand, both feet, and sacrum and coccyx. (*Id*. at 317-22, 462.) X-rays of her hips, right hand, and both feet showed no evidence of fractures or dislocations, unremarkable soft tissues, no erosions, and preserved joint spaces. (*Id*. at 317-22.) She did have hallux valgus angulation of the first MTP joint in her left foot, however. (*Id*. at 321.) The x-ray on her spine was performed due to psoriatic arthropathy and showed that the vertebral bodies had normal height, alignment, and density, there was no subluxation or fracture, and the soft tissues had normal appearance. (*Id*. at 319.) The results of the x-ray of her sacrum and coccyx were unremarkable. (*Id*. at 462.)

On July 22, 2014, an MRI was performed on Plaintiff's lumbar spine. (*Id*. at 323.) The results indicated that Plaintiff had a congenitally narrow central canal secondary to short pedicles, multilevel facet osteoarthritis, but no neural foraminal stenosis, and that her central canal was mildly narrowed below the L3-L4 level. (*Id*. at 324.) MRIs were also performed on her right and left thighs and showed bone marrow edema within the proximal left and right femoral shafts, presumably related to stress or overuse, and no discrete fractures. (*Id*. at 325-28.)

Also on July 22, 2014, Plaintiff saw Gena Nelson, R.N., for a follow-up appointment and medication management. (*Id*. at 707.) Plaintiff reported impaired mobility, joint pain, and stiffness. (*Id*.) She described chronic depressive symptoms that occurred daily, as well as chronic anxiety symptoms. (*Id*.) She denied having suicidal thoughts or intentions, but stated that she previously had thoughts about there being no point in "going on." (*Id*.) She expressed feelings of frustration, anxiety, guilt, helplessness, and sadness, and Nurse Nelson discussed coping with chronic pain and depression with her. (*Id*. at 709.) Nurse Nelson noted that Plaintiff had taken her medication regularly, her behavior had been stable and unremarkable, and she described no side effects, and none were evidenced. (*Id*. at 707.) Plaintiff appeared friendly, attentive, fully communicative, and casually groomed, but she "look[ed] unhappy," and there were signs of severe depression. (*Id*. at 708.) Her affect was appropriate, full range, and congruent with her mood; her thinking was tangential and logical; her thought content was appropriate; she had no apparent signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic processes; and she denied having suicidal or homicidal ideas or intentions. (*Id*.) Her cognitive functioning and fund of knowledge was intact; she was fully oriented; her social judgment was fair; her short and long term memory, as well as her ability to abstract and do math calculations was intact; and she had fair

insight into problems. (*Id*.) There were no signs of hyperactive or attentional difficulties, but there were signs of anxiety. (*Id*.) Her muscle strength, muscle tone, gait, and station were all normal. (*Id*.) She was diagnosed with major depressive disorder, generalized anxiety disorder, and insomnia disorder, and she had a global assessment of functioning (GAF) score of 50. (*Id*. at 709.) Nurse Nelson noted that Plaintiff continued to exhibit symptoms of an emotional disorder that interfered with her day-to-day functioning, and that she was in need of medication management. (*Id*.) Plaintiff's medications included Cymbalta, Xanax, Ambien, Gamaguard, Tizanidine, and Abilify. (*Id*. at 709-710.)

On July 31, 2014, Plaintiff underwent a three-phase bone scintigraphy due a disorder of her bone cartilage and an abnormal MRI of her left femur. (*Id*. at 329.) The results showed mild non-specific increased cortical activity within the femur bilaterally and no focal abnormal activity corresponding to the area of abnormality shown in the recent MRI. (*Id*.) Plaintiff also underwent a whole body scintigraphy study, which showed scattered areas of increased activity likely due to degenerative disease, but there was no focal abnormal uptake involving the proximal left femur. (*Id*. at 331.)

On August 5, 2014, Plaintiff saw Robert J. Meador Jr., M.D., with complaints of mixed connective tissue disease (MCTD). (*Id*. at 650.) She reported that she continued to have severe pain, and that her knees, hips, and toes were still very painful. (*Id*.) She was having pain with lifting objects and even pressing on the accelerator, felt like she was going to fall a lot, had trouble getting out of the shower, had weakness all the time, had a lot more stiffness in the morning, and broke out in sweats when she had pain. (*Id*.) She also complained of fatigue, malaise, dry eyes, dry mouth, constipation, back pain, joint pain, muscle cramps, muscle weakness, muscle aches, muscle

spasms, stiffness, morning stiffness, leg pain with exertion, scalp pain, rashes and dryness, frequent headaches, difficulty walking, weakness, anxiety, and enlarged lymph nodes. (*Id*. at 651-52.) Dr. Meador determined that her problems included MCTD, unspecified disorder of bone and cartilage, and myalgia and myositis. (*Id*. at 653-54.) Her medications included Atrovent, Cymbalta, Fiberchoice, Gammagard, ibuprofen, Losartan potassium, melatonin, multivitamins, Noritate, Olux, probiotics, Relpax, Xanax, Zithromax, Zyrtec, Tizanidine, folic acid, Plaquenil, hydrocodone, and Methotrexate. (*Id*. at 654.)

On August 27, 2014, Plaintiff saw James T. Rester, M.D., at Lake Pointe Medical Partners (Lake Pointe), for myalgia, rash, and hypertension. (*Id*. at 339.) Her myalgia symptoms had begun 5 months prior to this appointment. (*Id*.) She was in a lot of pain, which she described as throbbing aches that were intense to dull, but never completely gone, although resting helped. (*Id*.) She reported trouble working during the day and staying on task; she felt like her mind was foggy and "having short term memory for simple tasks," and she would nod off to sleep at her desk. (*Id*.) At home, she was limited in washing dishes, sweeping, mopping, bending down to clean or get clothes, and grocery shopping due to her pain. (*Id*.) She could sleep 12-14 hours on the weekends and still take a nap, and she lost the desire to do many things due to pain. (*Id*.) Just standing hurt her. (*Id*.) She listed her symptoms as muscle pain, tendon pain in her ankles, knees, and groin area, pain in the bottom of her feet, lower back spasms that woke her up, pain between her shoulder blades, low grade fevers, and great toe pain bilaterally. (*Id*.) It also hurt her hands to write sometimes. (*Id*.) She was becoming depressed and lost in the pain, which had been ongoing since March 2014. (*Id*.) She also complained of back spasms with some shooting pains into her buttocks intermittently that did not radiate to her legs. (*Id*.) Her rash affected multiple areas, and it was not associated with

contact with chemicals, plants, perfume, soaps, or lotions. (*Id*.) Associated symptoms included fatigue, myalgia, and pruritus. (*Id*.) Regarding her hypertension, associated symptoms included fatigue, and pertinent negatives included chest pain, dyspnea, headaches, irregular heartbeat, nausea, and vomiting. (*Id*.) Her physical exam was normal, except that she had an obese abdomen with abdominal tenderness and tenderness in her hip, knee, and ankle. (*Id*. at 342.) Her medications included Atrovent, Cymbalta, Flector, gabapentin, hydrocodone, Losartan, melatonin, Olux, Relpax, Tizanidine, tramadol, Xanax, Zithromax, and Zyrtec. (*Id*. at 342-43.) She was assessed with fibromyalgia, bursitis, hypertension, and fatigue. (*Id*. at 343.)

On September 16, 2014, an MRI was performed on Plaintiff's brain due to headaches, imbalance, sleep disturbance, and chronic fatigue. (*Id*. at 335.) The results showed a small area of focal left parietal cortical hypoplasia or atrophy, mild "teacher" per density in the pons that was nonspecific but usually related to microvascular disease, possibility of demyelinating disease, no acute ischemia, mass or hemorrhage, no abnormality of the temporal bones, and mild mucosal thickening in the left ethmoid and left frontal tissues. (*Id*. at 335.) X-rays were also performed on her left and right femurs and showed no acute abnormalities. (*Id*. at 337-38.)

On October 14, 2014, Plaintiff saw Julio Andino, M.D., at Alliance Neurodiagnostics, upon referral from Dr. Rester, for an evaluation of her cognitive dysfunction and confusion. (*Id*. at 538.) She reported that she had been experiencing symptoms for about 6 months. (*Id*.) She had been having confusion at work, and she was forgetting things and not performing her tasks as she had in the past. (*Id*.) The previous day, she "roomed" a patient and did not remember anything about "rooming" the patient. (*Id*.) She stated that she lost about 10-15 minutes and omitted information and tasks that were normally done when "rooming" a patient. (*Id*.) She also stated that she

frequently missed time, and felt that she lost consciousness and dozed off while she was drawing blood from patients. (*Id*.) When she would regain consciousness, she would feel confused. (*Id*.) She presented with a note from work stating that her work tasks had been affected, and that there was a decrease in concentration. (*Id*.) She endorsed blurry vision that could last for hours, and episodes where her writing deteriorated and was unintelligible. (*Id*.) After arriving home from work, she could "pass out" on the couch and needed to be shaken aggressively to awaken. (*Id*.) She slept about 6-9 hours per workday, and up to 14 hours on the weekends, but she still felt tired all the time and unrested. (*Id*.) She was well-nourished and ambulated independently, and was oriented to person, place, problem, and time. (*Id*.) Her mood, affect, and language were appropriate, her memory was intact, and she had a knowledge of current events and past history. (*Id*.) Her examination was normal, and there were no focal findings. (*Id*. at 539.) Dr. Andino expressed concern that her events of confusion and decreased concentration were epileptic in nature. (*Id*.) He assessed seizures, hypersomnia, and demyelination of the spinal cord. (*Id*.)

On October 16, 2014, Plaintiff underwent a routine electroencephalogram (EEG) with Dr. Andino. (*Id*. at 514.) It was noted that she had a history of left parietal congenital hypoplasia, hypersomnia, and seizure-like symptoms. (*Id*.) Her medications included Allegra, Cymbalta, Xanax, Zithromax, and Nasonex. (*Id*.) No significant asymmetry, epileptiform discharges, or electrographic seizures were detected. (*Id*. at 515.)

On October 27, 2014, an MRI was performed on Plaintiff's thoracic spine. (*Id*. at 423.) There was no abnormal edema or enhancement, and no canal or foraminal stenosis; the MRI appeared normal. (*Id*.) An MRI was also conducted on her cervical spine and revealed a disc osteophyte complex at C6-C7 in conjunction with facet osteoarthritis, which contributed to a central

canal and severe left and moderate right foraminal stenosis. (*Id*. at 424.) No abnormal cord edema or enhancement was identified. (*Id*.)

On November 16, 2014, Plaintiff underwent a diagnostic polysomnography at Lake Pointe's sleep center. (*Id*. at 426.) She was diagnosed with mild obstructive sleep apnea (OSA) and hypersomnia. (*Id*. at 426-27.)

Upon referral from Dr. Rester, Plaintiff saw Pooja Banerjee, M.D., for a rheumatology evaluation on November 18, 2014. (*Id*. at 541-44.) She reported that she had previously been diagnosed with psoriatic arthritis, MCTD, and fibromyalgia, and she complained of diffuse aches and pains all over with subjective weakness, but without associated objective weakness. (*Id*. at 541.) She also reported pain and swelling in her knees and ankles. (*Id*.) Dr. Banerjee noted that previous nerve conduction studies and EEG tests were unremarkable. (*Id*.) In her physical exam, she was alert and oriented times 3, her blood pressure was 128/74, she had full range of motion without evidence of active synovitis of upper and lower extremities, and her muscle strength was 5/5 all over. (*Id*. at 542-43.) Dr. Banerjee spent over an hour reviewing her labs with her, and her extensive work-up had been rather unremarkable. (*Id*. at 543.) She was assessed with a history of psoriasis and psoriatic arthritis, muscle weakness with episodic elevation, myalgias with low vitamin D levels, and OSA. (*Id*.)

On November 29, 2014, Plaintiff returned to the sleep center for a continuous positive airway pressure (CPAP) titration. (*Id*. at 428.) She was again diagnosed with mild OSA and hypersomnia, and CPAP therapy was recommended. (*Id*.)

On December 8, 2014, Plaintiff met with Nurse Nelson for a follow-up. (*Id*. at 703.) Plaintiff had a setback and was worse, and she had even less energy than before. (*Id*.) She reported

that she was too somnolent to work and had been on medical leave from work. (*Id*.) Nurse Nelson noted that her recent sleep study showed that she was not going into REM sleep. (*Id*.) Plaintiff reported that she performed domestic tasks with difficulty. (*Id*.) She had not taken her medication regularly, and she described symptoms of depression, including depressive moods that occurred daily. (*Id*.) She had no suicidal ideas or intentions, and she described her thoughts as racing. (*Id*.) Nurse Nelson noted that her symptoms had worsened and were far more frequent, and that Plaintiff looked unhappy, her affect was blunted, and there were signs of anxiety and severe depression. (*Id*. at 704.) The remainder of her examination was unremarkable. (*Id*.) Plaintiff was diagnosed with major depressive disorder, generalized anxiety disorder, and insomnia disorder, and she had a GAF score of 50. (*Id*. at 705.) Nurse Nelson found that Plaintiff was non-compliant with her medications, depressed, and anxious, but noted that she did well on Paxil and had been taking Xanax for insomnia and anxiety. (*Id*.) Plaintiff's medications were adjusted. (*Id*. at 705-06.)

On December 12, 2014, Plaintiff presented to Delano S. Fabro Jr., D.O., for a follow-up for her sleep apnea and hypersomnia. (*Id*. at 519-26.) She did not report improvement in her intolerance of, and non-compliance with, therapy. (*Id*. at 519.) She had a body mass index (BMI) of 31.73 and experienced 5.8 occurrences of apnea-hypoapnea per hour. (*Id*.) The apnea was worsened by significant weight gain and sleeping supine, and improved by sleeping prone. (*Id*.) She denied waking up with choking, shortness of breath, depression, difficulty concentrating, difficulty initiating sleep, difficulty maintaining sleep, gasping during sleep, headache, heartburn, insomnia, irritability, nasal congestion, nocturia, non-restorative sleep, personality changes, poor or worsening memory, sleep attacks, snoring, sore throat upon awakening, weight gain, wheezing, witnessed apnea, or irregular nighttime breathing. (*Id*.) Review of symptoms was negative, and her

physical exam was normal except for her nasopharynx. (*Id*. at 519, 524.) She was assessed with OSA and chronic hypersomnia. (*Id*. at 524-25.)

On December 23, 2014, Plaintiff saw Dr. Rester for a general follow-up regarding her hypertension, immune deficiency, joint pains, and migraines. (*Id*. at 567.) She reported that she had been sleeping unrefreshed for up to 16-18 hours per day, but other days she would not sleep at all due to anxiety. (*Id*.) Neither Ambien, Xanax, nor Clonazepam helped her sleep on nights that she had anxiety. (*Id*.) Symptoms associated with her hypertension included dyspnea, fatigue, headaches, irregular heartbeat, nausea, and vomiting. (*Id*.) Medication was not helping much with her joint pain, and she complained of neck pain into her shoulders, bilateral lower back pain into her hips, arm tenderness, toe pains, and "hand PIPs and elbows" without swelling or redness in her joints. (*Id*.) She had 2 fingers with numbness and tingling, and her left elbow became tender easily with leaning on it. (*Id*.) She also reported that her migraines had worsened, and that her symptoms were associated with stress, but medication relieved them. (*Id*. at 567-68.) Associated migraine symptoms included dizziness, nausea, phonophobia, photophobia, neck stiffness, and vomiting. (*Id*. at 568.) Her medications included Ambien, Atrovent, Cymbalta, hydrocodone, losartan, melatonin, Metamucil, multivitamins, Paxil, Relpax, Tizanidine, vitamin D3, Zithromax, Zyrtec, and Clonazepam. (*Id*. at 569-70.) Her physical exam was normal, except she had pale nasal mucus, respiratory auscultation, an obese and rounded abdomen, and puffy hands with tenderness in her left hand. (*Id*. at 571.) She was assessed with hypertension, fibromyalgia, MCTD, extrinsic asthma, OSA syndrome, hypersomnia, insomnia, anxiety, depression, migraine headaches, common variable immunodeficiency (CVID), and tobacco abuse. (*Id*. at 572.) Dr. Rester added Cartia, Doxepin, and Dulera to Plaintiff's medications, and stopped losartan, modafinil, and Relpax. (*Id*. at 573.)

On January 5, 2015, Plaintiff saw Nurse Nelson for another follow-up. (*Id.* at 699.) She had minimal response to treatment, and her anxiety symptoms had continued. (*Id.*) She reported chronic episodes of anxiety symptoms, and there had been no changes in her sleep difficulties. (*Id.*) Her fibromyalgia was also flaring up and causing a lot of pain. (*Id.*) She denied symptoms of depression, suicidal ideas or intentions, symptoms of mania, symptoms of psychotic processes, or substance abuse issues. (*Id.* at 700.) She looked unhappy, exhibited signs of mild depression, had blunted affect, and showed signs of anxiety. (*Id.*) The remainder of her exam was unremarkable, and her muscle strength, muscle tone, gait, and station were all normal. (*Id.*) Plaintiff was diagnosed with severe, recurrent major depressive disorder, generalized anxiety disorder, and insomnia disorder, and she had a GAF score of 50. (*Id.* at 700-01.)

On January 13, 2015, Plaintiff met with Dr. Meador. (*Id.* at 486, 642-43.) She complained of joint pain, numbness/tingling in her hands, and weakness. (*Id.* at 645.) Neurologically, she was anxious, but she was in no acute distress and she was alert and oriented times 3. (*Id.* at 645-46.) Following examination, she was assessed with unspecified myalgia and myositis, psoriatic arthropathy, MCTD, and degeneration of her lumbar or lumbosacral intervertebral disc. (*Id.* at 487, 646-47.) Dr. Meador found that her symptoms of psoriatic arthropathy caused days with severe back pain, which made rigorous activity very painful, and tasks requiring heavy lifting or having to sit or stand for prolonged periods of time without breaks exacerbated the condition and were harmful to the spine. (*Id.* at 646.) Also, she was impaired in lifting or carrying objects and focusing on tasks due to chronic pain, and there could be a need for additional accommodations in the future, such as mobility assistance. (*Id.*) Dr. Meador discontinued her Tizanidine and Methotrexate, and added Lidoderm. (*Id.* at 486.) He noted that her medications included Atrovert, Paxil, Fiberchoice,

Gammagard, ibuprofen, Losartan potassium, melatonin, Noritate, Olux, Relpax, Xanax, Zithromax, Zyrtec, hydrocodone, Cardizem, Plaquenil, and Lidoderm.  (*Id*. at 486-87, 643-44.)

On January 16, 2015, Plaintiff saw Dr. Fabro for a follow-up for sleep apnea and hypersomnia.  (*Id*. at 668-73.)  Dr. Fabro noted that she previously had CPAP therapy with fair response, and that her apnea was worsened by significant weight gain and sleeping supine, but improved with sleeping prone.  (*Id*. at 668.)  A review of symptoms was mostly negative, except Plaintiff was positive for fatigue, hypersomnia, and non-restorative sleep.  (*Id*. at 668-69.)  Her blood pressure was 122/89.  (*Id*. at 670.)  Her physical exam was normal, and she was assessed with OSA syndrome and hypersomnia.  (*Id*. at 671-72.)

On February 2, 2015, Plaintiff presented to Nurse Nelson for a follow-up and medication management.  (*Id*. at 695.)  She was partially improved but reported continued chronic depressive symptoms and daily depressive moods.  (*Id*.)  Her symptoms had improved and were far less frequent or less intense, however.  (*Id*.)  Anergia was still present and essentially unchanged.  (*Id*.)  She denied episodes of recent sadness, reported less difficulty sleeping, and denied suicidal ideas or intentions, but her anxiety symptoms continued.  (*Id*.)  Her anxiety was related to her economic stressors of not getting paid from her job since she had been out on medical leave.  (*Id*.)  She was taking at least one whole Xanax daily, but described no side effects.  (*Id*.)  Nurse Nelson again assessed recurrent, severe major depressive disorder, generalized anxiety disorder, and insomnia disorder, and a GAF of 55.  (*Id*. at 696-97.)  Nurse Nelson noted that Plaintiff had been improving on Paxil, and her medications were adjusted.  (*Id*. at 697.)

On February 10, 2015, Plaintiff underwent a comprehensive polysomnogram.  (*Id*. at 676.)  Her medications included Cymbalta, Losartin, Xanax, Ambien, multivitamins, and Zyrtec, and her

medical history included impaired cognition, anxiety, depression, insomnia, and high blood pressure. (*Id*.) The study reflected idiopathic hypersomnia. (*Id*.)

On March 3, 2015, Plaintiff saw Nurse Nelson again for a follow-up. (*Id*. at 691.) She had tried to stop taking Paxil when her health insurance lapsed, but she became too anxious and started taking it again, which helped. (*Id*.) She had chronic episodes of anxiety, and symptoms of irritability were present. (*Id*.) She denied being inattentive, impulsive, or disorganized; had no depressive symptoms; denied suicidal ideas or intentions; had no symptoms of mania; had no hallucinations, delusions, or other psychotic symptoms; reported no difficulty sleeping; had no recent episodes of sadness; and denied having recent feelings of anger. (*Id*.) Her behavior had been stable and uneventful, and her medication compliance was good. (*Id*.) Her medical diagnoses included hypertension, psoriatic arthritis, psoriasis, immunoglobulin deficiency, and hypersomnia. (*Id*. at 692.) Her examination was normal, except she appeared anxious. (*Id*.) She had no signs of depression or mood elevation, and there were no signs of hyperactive or attentional difficulties. (*Id*.) Her muscle strength, muscle tone, gait, and station were all normal. (*Id*.) She was diagnosed with recurrent, severe major depressive disorder, generalized anxiety disorder, and insomnia disorder, and she had a GAF score of 60. (*Id*. at 692-93.) Nurse Nelson found that Plaintiff was doing fairly well despite stressors and her high anxiety. (*Id*. at 693.)

On April 17, 2015, Plaintiff saw Dr. Meador for a follow-up for her undifferentiated connective tissue disorder. (*Id*. at 737.) She reported pain and swelling in her joints, stiffness in the morning, chronic pain in her hips, and swelling in her hands, feet, ankles, and eyes. (*Id*.) She also noted that her ankles would twist and give out easily. (*Id*.) She had headaches and also had trouble with dropping things and her hands trembling. (*Id*.) In addition to having back pain, joint pain,

stiffness, and morning stiffness, she had been depressed and anxious. (*Id*. at 738.) She had pain in her hips, back, feet, neck, and shoulders, which she described as chronic deep aching pain. (*Id*. at 739.) Her physical exam was unremarkable, but she still had anxiety that was unchanged from her prior appointment. (*Id*.) A detailed back/spine exam revealed tenderness to palpation in her thoracic paraspinals, lumbar paraspinals, and R-S1 joints. (*Id*. at 740.) A knee exam showed tenderness to palpation in her medial joint lines, lateral joint lines, and parapatellars. (*Id*.) Dr. Meader found that she had features of fibromyalgia, MCTD, and psoriatic arthritis. (*Id*.) She was diagnosed with degeneration of her lumbar or lumbosacral intervertebral disc, psoriatic arthropathy, MCTD, and myalgia and myositis. (*Id*. at 740-41.) Dr. Meador found that her symptoms caused days with severe back pain, which would make rigorous activity very painful, and that tasks requiring heavy lifting or having to sit or stand for prolonged periods of time without breaks would exacerbate her condition and were harmful to her spine. (*Id*. at 740.) He further stated that there could be a need for additional accommodations in the future, such as mobility assistance. (*Id*. at 740-41.) Her medications were adjusted, and she was instructed to set up a follow-up appointment. (*Id*. at 742.)

On May 6, 2015, Betty Santiago, M.D., a state agency medical consultant (SAMC), completed a physical residual functional capacity (RFC) assessment for Plaintiff based on the medical evidence of record. (*Id*. at 69-70.) She opined that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk with normal breaks for about 6 hours in an 8-hour workday; sit with normal breaks for about 6 hours in an 8-hour workday; and push, pull, and operate hand and/or foot controls without limitations. (*Id*. at 69.) She further opined that Plaintiff had no postural limitations, manipulative limitations, visual limitations, communicative limitations, or environmental limitations. (*Id*.) Dr. Santiago found that Plaintiff's allegations were

partially supported by the medical evidence of record, but noted that her alleged limitations were not consistent with the medical evidence in the file. (*Id*. at 70.) On July 20, 2015, Scott Spoor, M.D., a SAMC, also completed a physical RFC for Plaintiff, and his opinions were the same as Dr. Santiago's. (*Id*. at 94-96.)

On May 7, 2015, Margaret Meyer, M.D., a state agency psychological consultant (SAPC), completed an evaluation of Plaintiff's "Medically Determinable Impairments and Severity" based on the evidence of record. (*Id*. at 77-79.) Dr. Meyer opined that Plaintiff had only mild restrictions in activities of daily living; mild difficulties in maintaining social function; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. (*Id*. at 78.) She found that Plaintiff's alleged limitations were only partially supported by the medical evidence. (*Id*. at 79.) On July 22, 2015, Leela Reddy, M.D., a SAPC, completed the same evaluation for Plaintiff, and her opinions were identical to Dr. Meyer's. (*Id*. at 91-93.)

On June 9, 2015, Plaintiff saw Nurse Nelson for a follow-up and medication management. (*Id*. at 758.) She had financial stress and stress from her daughter acting out, and her anxiety symptoms were chronic and more frequent or intense. (*Id*.) She reported continued and chronic depressive symptoms that occurred daily, as well as increased symptoms of anhedonia. (*Id*.) She denied suicidal ideas or intentions, but wished to be dead. (*Id*.) Her muscle strength, muscle tone, gait, and station were all normal, and she appeared as friendly, attentive, communicative, casually groomed, and a normal weight. (*Id*. at 759.) The remainder of her examination was normal, except she looked unhappy, had signs of severe depression, and had blunted affect. (*Id*.) Her diagnoses included major depressive disorder, generalized anxiety disorder, and insomnia disorder, and she had a GAF score of 50. (*Id*. at 760.) Nurse Nelson found that she had increased depression and

anxiety with recent stressors, and she adjusted her medications.  (*Id*. at 760-61.)

From September 22, 2015 to April 29, 2016, Plaintiff met with Nurse Nelson for several follow-up appointments.  (*Id*. at 901-25.)  In September, Plaintiff had stopped taking Paxil but started using it again because she felt so bad, and she also reported panic attacks.  (*Id*. at 922.)  In October, she showed a partial response to treatment and had not been having difficulty sleeping.  (*Id*. at 918.)  She continued to take Valium but still described symptoms of depression.  (*Id*.)  In December, she reported unchanged symptoms of the same frequency or intensity as previously described, difficulty sleeping, and sleeping a lot during the day.  (*Id*. at 913.)  In March, Nurse Nelson noted that Plaintiff had a setback and seemed worse.  (*Id*. at 909.)  She described "racing" thoughts, and her anxiety was causing sleep disturbance.  (*Id*.)  She also described feelings of sadness and hopelessness.  (*Id*.)  She had a poor appetite and had accidently been taking the wrong dosage of Paxil.  (*Id*.)  In April, she had partial responses to treatment and reported improvement in her symptoms.  (*Id*. at 901, 905.)  She also reported excessive fatigue at her initial April appointment, and episodes of tachycardia, rapid breathing, and sweating at her second April appointment.  (*Id*. at 901, 905.)  Throughout her appointments, she consistently reported increased or more frequent anxiety that was chronic, as well as continued depressive symptoms.  (*Id*. at 905, 909, 913, 918, 922.)  Her examinations revealed signs of depression and anxiousness at times, as well as blunted affect, but they were otherwise unremarkable.  (*Id*. at 902, 906, 910, 914-15, 919, 923.) Nurse Nelson noted that Plaintiff continued to exhibit symptoms of an emotional disorder that interfered with her day-to-day functioning.  (*Id*. at 903, 907, 916, 920, 924.)  Her diagnoses included major depressive disorder that was severe and recurrent, generalized anxiety disorder, insomnia disorder, and idiopathic hypersomnia with long sleep time.  (*Id*. at 903, 906-07, 911, 915, 919-20,

924.) Her GAF scores ranged from 50 to 60. (*Id*.) Nurse Nelson frequently adjusted her medications. (*Id*. at 903-04, 907-08, 911-12, 916, 920-21, 924-25.)

On September 24, 2015, Plaintiff went to the Greenville Community Health Center (GCHC) with symptoms of a cold. (*Id*. at 928.) She received a total score of 9 on her patient health questionnaire, which revealed mild depression. (*Id*. at 929.) She had felt down, depressed, or hopeless for several days, and had little interest or pleasure in doing things. (*Id*. at 930.) She presented to GCHC again on December 3, 2015, for a physical, and it was noted that her medical history included hypersomnia, fibromyalgia, and MCTD. (*Id*. at 933.) Her physical exam was normal. (*Id*. at 934.) At her second appointment on December 11, 2015, she had pain in her thighs, hypersomnia, and OSA. (*Id*. at 937-38.) Her medications included Clobetasol, Doxepin, Ipratropium Bromide, Relpax, Tizanidine, Valium, and Zrytec. (*Id*. at 938.)

On March 28, 2016, Plaintiff underwent an all night polysomnogram at Hunt Regional Medical Center (HRMC) for evaluation of her sleep breathing disorders. (*Id*. at 896.) Her chief complaints were excessive daytime sleepiness and fatigue. (*Id*.) She was found to have moderate OSA with an apnea-hypopnea index of 26.6 events per hour. (*Id*. at 897.) It was recommended that she return for a CPAP titration to correct her OSA, lose weight for long-term management of her OSA, and avoid sleeping in a supine position. (*Id*.) It was also noted that she should exercise caution while driving until her symptoms of daytime sleepiness were corrected. (*Id*.)

On April 26, 2016, Plaintiff presented to GCHC for hypertension and fibromyalgia. (*Id*. at 954.) She stated that her hypertension had started in 2008 and was currently stable. (*Id*.) Her fibromyalgia started a year before, and the pain was still strong and all over. (*Id*.) She was seeing a pain management doctor. (*Id*.) Her review of systems was negative and her physical exam was

normal, except for a small red papule/nodule on her left groin. (*Id*. at 955-56.) She was assessed with fibromyalgia, OSA, hypertension, and cellulitis of her groin. (*Id*. at 957.)

On May 11, 2016, Plaintiff underwent a hysterectomy at GCHC. (*Id*. at 972.) It was noted that she was feeling down, depressed, or hopeless, and had little interest or pleasure in doing things. (*Id*. at 973.) A physical exam showed she was well-developed, oriented to time, place, person, and situation, and her mood and affect were appropriate. (*Id*. at 974.) At a later appointment, she reported that she was having increased pelvic pain. (*Id*. at 978.)

### 3. Hearing Testimony

On July 6, 2016, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id*. at 33-61.) Plaintiff was represented by an attorney. (*Id*. at 33, 35.)

#### a. *Plaintiff's Testimony*

Plaintiff testified that her date of birth was July 14, 1979, she was right handed, and she lived on the same property as her parents. (*Id*. at 38.) She had a 10-year-old daughter that lived with her. (*Id*. at 38-39.) She had completed the 12th grade and also had received her registered medical assistant license and non-certified radiology degree. (*Id*. at 38-40.) Her father drove her to the hearing, but she had a driver's license and mostly drove in the evenings. (*Id*. at 39.) From 2001-2014, she worked as a medical assistant at various medical centers, and she last worked in October 2014. (*Id*. at 40.) Her duties as a medical assistant included taking vital signs, drawing blood, and gathering medical histories. (*Id*.)

She could not work because of her sleep problems, MCTD, and fibromyalgia. (*Id*. at 41.) She had pain in her lower back and in both hips (predominantly in her right), ankles, knees, and hands. (*Id*. at 41-42.) Her pain radiated sometimes, and it became worse if she tried to lift, bend,

or walk continuously.  (*Id*. at 42.)  It was relieved at times by pain medication, cool water, and lots of rest.  (*Id*.)  She rated her pain at about a 7-8 out of 10, and she was in pain all day every day.  (*Id*.)  She was also fatigued every day, even when she slept 12-14 hours.  (*Id*.)  She felt that her symptoms were getting worse.  (*Id*. at 43.)  She had undergone testing to figure out if she had MCTD or fibromyalgia in her leg, as well as multiple sleep studies and changes to her CPAPs to find the right one.  (*Id*. at 43.)  Her pain management doctor had placed a restriction on her to be able to lift only 15 pounds.  (*Id*. at 44.)  Her medications included vitamin D, Zyrtec, micardis, Paxil, Tizanidine, oxycodone, Relpax, Clobetasol, Mucinex, sinus rinse, Miralax, Ipratropium, and Xanax.  (*Id*. at 44-45.)  She did not have any side effects from her medications.  (*Id*. at 45.)  Her pain management doctor also performed acupuncture on her sometimes.  (*Id*.)  She was not in therapy for her mental health issues at the time of the hearing, and Nurse Nelson was the one who provided her with her prescription for Xanax.  (*Id*. at 45-46.)

Plaintiff had memory problems such that she could not keep up with things, and she had to write everything down and make notes.  (*Id*. at 46.)  She had problems maintaining attention and concentration, which caused her to be unable to focus on one thing or "keep the memory recall." (*Id*.)  She also fell asleep a lot.  (*Id*.)  She did not have problems understanding information or instructions, making small decisions, or relating to others.  (*Id*.)  On a typical day, she woke up around 1 or 2 p.m., spent about an hour stretching to become mobile, picked up around the house, picked up her daughter when she had school, and then she and her daughter would walk to her parents' house for dinner.  (*Id*. at 47.)  After dinner, they would return home, work on her daughter's homework, and then she would go to bed between 10:30 and 11:30 p.m.  (*Id*.)  Sometimes it took her 2-3 days to shower.  (*Id*.)  She would grocery shop in the late evenings, but her dad had to get

dog food when she needed it. (*Id.*) She would also walk around the 20-acre property with her daughter about 3 times per week. (*Id*. at 47-48.) She guessed the walk was about 1/4 of a mile, and it took her about 30 minutes to walk it. (*Id*. at 48.)

Nurse Nelson prescribed her medication, and sometimes did some counseling and provided her with directions. (*Id*.) Paxil helped with her depression and crying, but did not stop it completely. (*Id*. at 48-49.) Even on medication, she found herself crying a couple of times per week for about an hour to an hour and a half. (*Id*. at 49.) When she had crying episodes, she increased her use of Xanax to try to help. (*Id*.) Regarding her anxiety, she would get overwhelmed very easily from not being able to do what she used to do. (*Id*.) She also took Ambien to help her sleep on days when she felt really bad, but even then she still had sleeping problems. (*Id*.) Her doctors had ordered her to be cautious while driving because of her falling asleep, and she tended to nod off. (*Id*. at 50.) Most days she did not think she could drive; at times she would drive to appointments or elsewhere and then feel that she was not safe to drive herself back, and she had to call for assistance. (*Id*.) She sometimes had fears of using public transportation because if anything happened, she would not be able to protect herself. (*Id*. at 50-51.) She also feared falling asleep on public transportation and missing her stop. (*Id*. at 51.)

Plaintiff did not think she could she could stay awake long enough in a job situation where she would be sitting and performing only mentally demanding work. (*Id*.) She tried to do it at home and failed. (*Id*.) There were times where she could not wash dishes or clothes because she would get sleepy and fall asleep. (*Id*. at 51-52.) Sometimes she was able to wash dishes for 30 minutes, sit down for 30 minutes, and return to washing for 30 minutes. (*Id*. at 53.) She usually stood for 30 minutes, then sat for 30-45 minutes, and then returned to whatever she was doing. (*Id*. at 53.) She

required about 2 naps during the day due to her sleeping problems. (*Id.*) She took naps most days when her daughter was in school, and she had to set alarms to be able to wake up to pick her up. (*Id.* at 53-54.) She had slept through her alarms before, and her dad had to pick up her daughter. (*Id.* at 54.) She also had swelling in her feet from walking, and some days she would elevate them because she could no longer be on her feet. (*Id.*) She had to elevate her feet up to about a foot about once every 2 weeks, and she would keep it elevated for a full day. (*Id.*) Her blood pressure had been running high and causing her to have very bad headaches. (*Id.* at 54-55.) She also had migraine headaches 2-3 times per month, and when they occurred, she had to mostly be in a dark and quiet room. (*Id.*) It usually took about 3-4 hours for the migraine to go away, and once it was gone, she was okay. (*Id.*)

### b. VE's testimony

The VE characterized Plaintiff's work history for the past 15 years as a medical assistant, DOT 079.362-010 (light, SVP 6). (*Id.* at 56-57.) Although that job was typically classified as light work, Plaintiff's position would have been at the heavy exertional level because she occasionally had to lift up to 100 pounds. (*Id.*)

The VE considered a hypothetical individual with the same age, education, and work history as Plaintiff who was limited to the light exertional level; could never climb ladders, ropes, or scaffolds; and should avoid all exposure to moving machinery and unprotected heights. (*Id.*) That hypothetical individual could not perform Plaintiff's past work as it was actually performed by Plaintiff, but the individual could perform the past work as it was normally performed in the national economy. (*Id.* at 57-58.) The individual could perform other work as a unit clerk, DOT 245.362-014 (light, unskilled), with about 4,100 jobs in Texas and about 41,000 jobs in the national

economy; medical records clerk, DOT 245.362-010 (light, SVP 4), with about 18,000 jobs in Texas and about 200,000 jobs in the national economy; cashier II, DOT 211.462-010 (light, unskilled), with about 8,000 jobs in Texas and about 40,000 jobs in the national economy; document preparer, DOT 249.587-018 (sedentary, unskilled), with about 5,500 jobs in Texas and about 32,000 jobs in the national economy; addresser, DOT 209.587-010 (sedentary, unskilled, SVP 2), with about 2,800 jobs in Texas and about 18,000 jobs in the national economy. (*Id.* at 58-59.) This testimony was consistent with the DOT. (*Id.* at 59.)

The VE next considered a hypothetical individual with the same age, education, and work history as Plaintiff who was limited to the light exertional level and had the same limitations as the first hypothetical individual. (*Id.*) The hypothetical individual also could understand, remember, and carry out detailed but not complex instructions; make decisions; attend and concentrate for adequately extended periods of time; interact with others; and respond appropriately to changes in a routine work setting. (*Id.*) This hypothetical individual could not perform Plaintiff's past work as actually performed or as generally performed in the national economy, but could perform the other work described in response to the first hypothetical. (*Id.*) This testimony was consistent with the DOT. (*Id.*)

The VE then considered a hypothetical individual with the same age, education, and work history as Plaintiff who had the same limitations as the second hypothetical individual, except that this individual also could not attend and concentrate for adequately extended periods of time and would be off task for 20 percent of the work day. (*Id.* at 59-60.) This hypothetical individual could not perform any of Plaintiff's past work as actually performed or as generally performed in the national economy. (*Id.* at 60.) The individual could not perform any other work. (*Id.*) This

testimony was consistent with the DOT. (*Id*.)

None of the hypothetical individuals would be able to maintain competitive employment if they were unable to show up to work at least one day per week due to a medical condition. (*Id*.) An individual would not be able to maintain competitive employment if she were required to take unscheduled work breaks, each morning and afternoon, of 15 minutes over and above those that were typically provided to employees by employers in the national economy. (*Id*.) Based on the VE's experience, an individual's ability to maintain employment would be adversely affected if she were falling asleep at her work station while at work on a regular basis. (*Id*. at 61.) Sedentary jobs would be able to accommodate an employee's need to prop one foot up 6-8 inches at least one day per week, but light jobs would not because they were performed while standing. (*Id*.)

C.    **ALJ's Findings**

The ALJ issued her decision denying benefits on October 6, 2016. (*Id*. at 18-27.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 24, 2014, the alleged onset date. (*Id*. at 19.) At step two, the ALJ found that she had the following severe impairments: undifferentiated and mixed connective tissue, MCTD, disorders of the back-discogenic and degenerative, sleep-related breathing disorders, fibromyalgia, bursitis, mild OSA, affective disorders, anxiety disorders, hypertension, and hypersomnia. (*Id*.) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (*Id*. at 22.)

Next, the ALJ determined that Plaintiff retained the RFC to perform light work but included the following limitations: she could never climb ladders, ropes, or scaffolds; never be exposed to

moving machinery and unprotected heights; understand remember, and carry out detailed but not complex instructions; make decisions; attend and concentrate for adequately extended periods; interact with others; and respond appropriately to changes in a routine work setting. (*Id*. at 24.)

At step four, the ALJ determined that Plaintiff was unable to perform her past work. (*Id*. at 25.) At step five, the ALJ found that transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Plaintiff was not disabled, but considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform. (*Id*. at 26.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from October 24, 2014, through October 6, 2016. (*Id*. at 27.)

## II. LEGAL STANDARDS

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson*

*v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are also identical to those governing the determination under a claim for supplemental security income. *See id*. Courts may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## III. ISSUES FOR REVIEW

Plaintiff presents one issue for review:

The Administrative Law Judge (ALJ) erred in determining Plaintiff's . . . residual functional capacity (RFC) and the RFC finding is not supported by substantial evidence.

(doc. 18 at 4.)

## IV. RFC DETERMINATION

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical

assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386–87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision, or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 160, 163–64 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts

may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, after making a credibility finding regarding her alleged symptoms and limitations, and reviewing the evidence of record, the ALJ found that Plaintiff had the RFC to perform light work with the following limitations: she could never climb ladders, ropes, or scaffolds; never be exposed to moving machinery and unprotected heights; understand remember, and carry out detailed but not complex instructions; make decisions; attend and concentrate for adequately extended periods; interact with others; and respond appropriately to changes in a routine work setting. (*Id*. at 24.)

## A. Consideration of Evidence

Plaintiff first argues that the ALJ failed to properly consider evidence of her mental and physical limitations in determining her RFC. (doc. 18 at 16-19, 21-25.)

As noted, a reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. In *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000), the Fifth Circuit held that an "ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." *Id*. (citing *Switzer v. Heckler*, 742 F.2d 382, 385–86 (7th Cir. 1984); *Garfield v. Schweiker*, 732 F.2d 605, 609 (7th Cir. 1984); *Green v. Shalala*, 852 F. Supp. 558, 568 (N.D. Tex. 1994); *Armstrong v. Sullivan*, 814 F. Supp. 1364, 1373 (W.D. Tex. 1993)). Likewise, the substantial evidence test does not involve a simple search of the record for isolated bits of evidence that support the ALJ's decision. *Singletary v. Bowen*, 798 F.2d 818, 822–23 (5th Cir. 1986). An ALJ must address and make specific findings regarding the supporting and conflicting

28

evidence, the weight given to that evidence, and reasons for his or her conclusions regarding the evidence. *Armstrong*, 814 F. Supp. at 1373.

The regulations require only that an ALJ consider and evaluate medical opinions. *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). They do not require an ALJ to state the weight given to each symptom and diagnosis in the administrative record. *See Proge v. Comm'r of Soc. Sec.*, No. 3:13-CV-310-SAA, 2014 WL 4639462, at *4 (N.D. Miss. Sept. 16, 2014) (applying 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)). There is no *general duty* of explanation or duty to provide rational and logical reasons for a decision. *Escalante v. Colvin*, No. 3:14-CV-0641-G, 2015 WL 1443000, at *14 (N.D. Tex. Mar. 31, 2015) (citing cases); *Norris v. Berryhill*, No. 3:15-CV-3634-BH, 2017 WL 1078524, at *21 (N.D. Tex. Mar. 22, 2017) (citing *Escalante*, 2015 WL 1443000, at *14).

### 1.    Mental Limitations

Plaintiff contends that the ALJ failed to properly consider her depression, anxiety, and hypersomnia in making her mental RFC assessment. (doc. 18 at 16-19, 21-22.)

### a.    Depression and Anxiety[2]

Plaintiff contends that "the ALJ chose to ignore overwhelming evidence of continuing depressive and anxiety symptoms in favor of a couple of isolated reports showing temporary 'partial' improvement in [Plaintiff's] symptoms." (*Id*. at 19.)

The ALJ clearly considered the medical evidence in the record regarding Plaintiff's depression and anxiety. (doc. 14-1 at 21.) She noted that treatment records contained reports of chronic depressive symptoms and anxiety, but that Plaintiff took multiple medications to control her symptoms. (*Id*.) The ALJ explicitly cited to Plaintiff's own testimony that she was not receiving

---

[2] These impairments may be considered together because Plaintiff addresses them together in her brief. (*See* doc. 18 at 16-19.)

therapy from a mental health professional, and that Paxil helped with her depression and crying. (*Id*.) The ALJ also pointed to the mental status examinations that appeared throughout the record and showed stable behavior, appropriate mood and affect, intact memory, and normal orientation. (*Id*.) She further noted the SAMC opinions which found that Plaintiff's mental health impairments were non-severe. (*Id*.) Because the ALJ relied on medical evidence in the record and Plaintiff's own testimony in making her RFC determination, her assessment was supported by substantial evidence. *See Greenspan*, 38 F.3d at 236 (noting in applying the substantial evidence standard, a reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment).

### b.     Hypersomnia

Plaintiff also asserts that "[t]he ALJ failed to properly consider the effects of [her] hypersomnia on her mental functioning." (doc. 18 at 21-22.)

The ALJ expressly considered Plaintiff's sleep study that showed only mild hypersomnia, as well as the physical examinations throughout the record that showed adequate sleep, and found that the examinations showed that her treatment was at least somewhat effective. (doc. 14-1 at 20-21.) She also considered third party statements that Plaintiff was unable to work because she was unable to stay awake, but found that the evidence of record contradicted that statement. (*Id*. at 22.) She also considered the SAMC opinions that Plaintiff's mental health impairments were non-severe and that she could perform light exertional level work, and found that they were consistent with the record and supported by detailed explanations. (*Id*. at 21.) Because the ALJ relied on medical evidence in the record in making his RFC determination, her assessment was supported by substantial evidence. *See Greenspan*, 38 F.3d at 236 (noting in applying the substantial evidence standard, a reviewing court does not reweigh the evidence, retry the issues, or substitute its own

judgment).[3]  Remand is therefore not required on this basis.

## 2.     Physical Limitations

Plaintiff next argues that the ALJ erred in determining her physical RFC because she failed to account for limitations from her MCTD, fibromyalgia, and CVID.  (doc. 18 at 23-26.)[4]

The ALJ considered Plaintiff's testimony that she experienced pain in her lower back, hip, ankles, toes, and hands; that the pain was continuous and radiated at times; and that lifting, bending, and continuous walking caused her feet to swell and exacerbated the pain.  (doc. 14-1 at 20.)  She determined that although Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, her "statements concerning the intensity, persistence[,] and limiting effects of [her] symptoms [were] not entirely supported by the record . . . ."  (*Id.*)

The ALJ then considered the medical evidence of record showing that Plaintiff had a history of MCTD and fibromyalgia, but found that diagnostic testing failed to substantiate the level of impairment she alleged.  (doc. 14-1 at 20.)  The x-rays and MRIs had mostly normal and unremarkable results.  (*Id.*)  Notably, the ALJ did not find there to be a history of CVID, and there does not appear to be a history of such a diagnosis in the medical evidence of record other than one diagnosis from Dr. Rester in December 2014.  (*See id.* at 20, 572.)  There is also no evidence in the record showing that CVID would require greater limitations than those already found by the ALJ in the RFC determination.  *Brown v. Barnhart*, 285 F. Supp. 2d 919, 936 (S.D. Tex. 2003) (finding

_____

[3] Plaintiff also argues that "the ALJ's mental RFC finding lacks specificity so as to preclude this Court from conducting meaningful review."  (doc. 18 at 22.)  She contends that the ALJ failed to define "adequately extended periods" and failed to specify how long she could interact with others.  (*Id.*)  Plaintiff "fails to show that the ALJ erred as a matter of law in not expressly defining" these terms in her RFC finding.  *Todd v. Astrue*, No. H-09-2687, 2010 WL 3894102, at *10 (S.D. Tex. Sept. 30, 2010).  Accordingly, this issue does not require remand.

[4] Plaintiff's physical impairments are considered together because Plaintiff discusses them together in her brief. (See doc. 18 at 23-26.)

no error where the ALJ failed to consider alleged conditions because there was no evidence that the conditions would limit the plaintiff's ability to work).

The ALJ also considered physical examinations in the record showing that Plaintiff had a normal gait, no edema, adequate sleep, and unremarkable neurological exams. (*Id*. at 21.) Although there were complaints of pain and stiffness at some examinations, "these abnormal clinical presentations were offset by generally benign presentations noted elsewhere in the record and by evidence of effective treatment." (*Id*.) The ALJ also noted the opinions from the SAMCs that Plaintiff could perform duties at the light exertional level and found them "consistent with the record as a whole and supported with a detailed explanation." (*Id*.)

Accordingly, the ALJ's RFC determination was supported by substantial evidence because she relied on the medical evidence in the record in making her decision. *See Greenspan*, 38 F.3d at 236 (noting in applying the substantial evidence standard, a reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment). Remand is also not required on this basis.

**B.**     **Ability to Maintain Employment**

Plaintiff next argues that the ALJ "failed to consider the waxing and waning nature of [her] depression and anxiety, and the effect on [her] ability to maintain employment. (doc. 18 at 19.)

A finding that a social security claimant is able to engage in substantial gainful activity requires "more than a mere determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job he finds for a significant period of time." *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986); *see also Leidler v. Sullivan*, 885 F.2d 291, 292–93 (5th Cir. 1981). This requirement extends to cases involving mental as well as physical impairments. *Watson v. Barnhart*, 288 F.3d 212,

217–218 (5th Cir. 2002). The ALJ is not required in every case to make specific and distinct findings that the claimant can maintain employment over a sustained period, however. *Frank v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005). An RFC determination itself encompasses the necessary finding unless the claimant's ailment, by its nature, "waxes and wanes in its manifestation of disabling symptoms." *See id.*; *Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005). A specific finding is required if there is "evidence that [the] claimant's ability to maintain employment would be compromised despite his ability to perform employment as an initial matter, or an indication that the ALJ did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of RFC." *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003). Allegations that an impairment causes good days and bad days do not by themselves require an explicit finding on the ability to maintain employment. *See Perez*, 415 F.3d at 465.

Here, Plaintiff points to evidence showing that she was too somnolent to work and out on medical leave in December 2014, and that she had ongoing symptoms of depression and anxiety which required adjustments to her medications. (doc. 18 at 17-18.) She also identifies Nurse Nelson's reports that her emotional disorders interfered with her day-to-day functioning. (*Id*. at 19.) She argues that her symptoms "waxed and waned", and that the ALJ was required to determine whether she could hold a job due to her "severe mental illness," but failed to do so. (*Id*. at 20.)

Although the record contains evidence that Plaintiff suffered from depression and anxiety, and that she had not worked since October 2014, there is no evidence that her symptoms waxed and waned in a manner that precluded employment. *See James v. Astrue*, No. 11-484-DLD, 2012 WL 4159326, at *5 (M.D. La. Sept. 18, 2012) (noting that "simply having a diagnosis of depression and/or anxiety" does not equate "to having a condition that waxes and wanes by its very nature.").

Nurse Nelson's reports that Plaintiff's emotional disorders interfered with her day-to-day functioning do not explain how they interfered or show that any interference from her symptoms would preclude her from employment. (*See* doc. 14-1 at 903, 907, 916, 920, 924.) While Plaintiff did have signs of depression and anxiety at times when she met with Nurse Nelson, her mental status examinations remained mostly unremarkable. (*Id*. at 902, 906, 914-15, 919, 923.) Plaintiff also consistently had normal muscle strength, muscle tone, gait, and station at these examinations. (*Id*.) Additionally, medical records and Plaintiff's own testimony reflect that her medications provided her with at least some relief, and that she suffered setbacks when she was non-compliant with her medications or taking the wrong dosage. (*Id*. at 48-49, 691, 697, 705, 909.) Moreover, the ALJ expressly considered the opinions from the SAMCs who found that Plaintiff could perform duties at the light exertional level and that her mental impairments were non-severe. (*Id*. at 21.)

Plaintiff has not presented any evidence that her ability to maintain employment would be compromised by her depression and anxiety, or that the ALJ did not appreciate that the ability to perform work on a regular and continuing basis was inherent in the definition of RFC. Under these circumstances, an express finding by the ALJ was not required, and substantial evidence exists to support the ALJ's decision. *See James*, 2012 WL 4159326, at *4–5 (determining that the plaintiff's symptoms of depression and/or anxiety did not wax and wane such that her ability to maintain employment was compromised); *see also Beale v. Colvin*, No. 3:15-CV-2736-BH, 2016 WL 5348717, at *15 (N.D. Tex. Sept. 22, 2016) (finding that the ALJ was not required to make a finding that the plaintiff could maintain employment). Reversal is therefore not warranted on this ground.

## C.    SAPC Opinions

Plaintiff next argues that the ALJ improperly relied on the psychological assessments of Drs.

Meyer and Reddy because they did not consider treatment records "covering a period of September 22, 2015 through April 29, 2016."  (doc. 18 at 20-21.)

Although Plaintiff claims that the SAPCs did not evaluate all of the record evidence, they had sufficient evidence to determine the severity of Plaintiff's impairments, and both Drs. Meyer and Reddy provided detailed explanations showing that they thoroughly examined the records before them before making their assessments.  (*See* doc. 14-1 at 67-68, 92-93.)  The records of Plaintiff's treatment after the SAPCs' assessment do not specify any limitations caused by her mental conditions that would call into question the SAPCs' assessment.  Plaintiff also "does not argue with particularity how those later medical records contradict the [SAPC] reports."  *Bauer v. Berryhill*, No. 7:17-CV-00128-M-BP, 2018 WL 3999687, at *3 (N.D. Tex. July 27, 2018) (citing *Rollins v. Berryhill*, No. 7:17-CV-00136-BP, 2018 WL 2064781, at *6 (N.D. Tex. May 2, 2018)), *adopted by*, 2018 WL 3993812 (N.D. Tex. Aug. 21, 2018).  Additionally, the ALJ expressly incorporated the treatment records that were created after the SAPCs' reports in making the RFC determination. (doc. 14-1 at 21-22, 25.)  Reversal is not required on this basis.

**D.    Treating Physician Opinions**[5]

Plaintiff also argues that the ALJ erred because she failed to properly evaluate Dr. Meador's opinions.  (doc. 18 at 26-27.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence.  20 C.F.R. § 404.1529(b).  Every medical opinion is evaluated

---

[5] Plaintiff also argues that the ALJ failed to properly evaluate Nurse Nelson's opinions.  (doc. 18 at 27.) Although the record reflects that Nurse Nelson treated Plaintiff several times, she was a nurse, and her opinions were not entitled to any weight.  *See Danny R. C. v. Berryhill*, No. 3:17-CV-1682-BH, 2018 WL 4409795, at *14 (N.D. Tex. Sept. 17, 2018); *see also Hayes v. Astrue*, No. 3:11-CV-1998-L, 2012 WL 4442411, at *3 (N.D. Tex. Sept. 26, 2012) (finding no error where the ALJ rejected the opinions of a treating registered nurse, explaining that "the ALJ was not required to give her opinions any weight" because she was "not an 'acceptable medical source'").

regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. *Id*. § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id*. § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id*. § 404.1527(c)(2). If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id*. § 404.1527(c)(1)–(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id*. A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id*. at 455–56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an

ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Plaintiff first points to Dr. Meador's conclusion that she was disabled, and his determination that she qualified for a permanent handicap parking placard. (doc. 18 at 26.) As the ALJ found, however, Dr. Meador's statement that Plaintiff was disabled was not a medical opinion and was not entitled to any special significance because the issue of disability is a legal conclusion reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d); *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (physician's opinion that a claimant is "disabled" or "unable to work" is not the type of doctor's opinion that is ever given "special significance" because it is legal conclusion reserved to the Commissioner.). Although Dr. Meador determined that she qualified for a parking placard, Plaintiff fails "to provide any statute, regulation, or case law establishing that the disability parking placard qualifies as an opinion that must be afforded any weight." *Kujawa v. Berryhill*, No. EP-16-CV-81-MAT, 2018 WL 3435355, at *2 (W.D. Tex. July 16, 2018) (citing cases); *see also Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009) ("[The claimant] argues that the ALJ should have given weight to her successful application for a disability parking placard [which was completed by her primary physician], but the placard proves nothing unless the disability standard is the same."); *Livingston v. Astrue*, No. 09-14202-CIV, 2010 WL 5851124, at *8 (S.D. Fla. Feb.

26, 2010) ("[D]isabled parking permits are generally of little relevance to a formal disability analysis.").

Plaintiff also relies on Dr. Meador's reported limitations of her functional abilities. (doc. 18 at 26.) In January 2015 and April 2015, Dr. Meador found that Plaintiff's symptoms caused days with severe back pain that made rigorous activity very painful. (doc. 14-1 at 646, 740.) He further found that tasks requiring heavy lifting or having to sit or stand for prolonged periods of time without breaks would exacerbate her condition and were harmful to the spine. (*Id*.) He also determined that lifting or carrying objects and focusing on tasks due to chronic pain were activities that had been impaired, and that Plaintiff could no longer lift things. (*Id*. at 646.)

The ALJ did not address these opinions from Dr. Meador in determining Plaintiff's RFC, and she did not weigh his opinions against opinions of any other treating or examining physician. (*See id*. at 21-22, 24-25.) She also did not provide any explanation as to why she did not consider or even discuss them. *See Kneeland v. Berryhill*, 850 F.3d 749, 760 (5th Cir. 2017) ("And fundamentally, '[t]he ALJ cannot reject a medical opinion without an explanation.'"). Rather, the ALJ relied on the SAMC's opinions that Plaintiff could perform duties at the light exertional level and found that those opinions were entitled to great weight. (*Id*. at 21.) The SAMCs are non-examining physicians, however, and "their opinions provide no basis to bypass the requisite detailed analysis." *Perry v. Colvin*, No. 13-CV-2252-P, 2015 WL 5458925, at *9 (N.D. Tex. Sept. 17, 2015) (citing *Newton*, 209 F.3d at 456–58, 460; *Meyers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001)); *see Kneeland*, 850 F.3d at 761 ("the reports of physicians who did not examine the claimant, taken alone, would not be substantial evidence on which to base an administrative decision." (internal quotations omitted)) (quoting *Strickland v. Harris*, 615 F.2d 1103, 1109 (5th Cir. 1980)).

Because there were no other treating or examining sources controverting his opinions, the ALJ was required to undergo a detailed analysis of the factors set forth in 20 C.F.R. § 404.1527(c)(2). Even if there was medical evidence from a treating or examining source controverting Dr. Meador's medical opinions and the ALJ was not required to undergo a detailed analysis of the (c)(2) factors, she was still required to provide "an explanation of the rejected medical opinion[s], or an explanation of what weight was assigned." *Kneeland*, 850 F.3d at 761; *see also Gomez v. Barnhart*, No. SA-03-CA-1285-XR, 2004 WL 2512801, at *2 (W.D. Tex. Nov. 5, 2004) ("[A]n ALJ who rejects the opinion of a treating physician must explain his reasons for doing so."). Because she failed to do so, the ALJ committed legal error, and her decision is not supported by substantial evidence. *See Kneeland*, 850 F.3d at 761 (finding that the ALJ erred where he failed to mention or consider an examining physician's opinion).

Having found error, the Court must still consider whether the ALJ's failure to address or properly evaluate Dr. Meador's opinions was harmless. *See Kneeland*, 850 F.3d at 761–62 (applying harmless error analysis where the ALJ failed to address or evaluate an examining physician's opinion); *McNeal v. Colvin*, 3:11-CV-02612-BH-L, 2013 WL 1285472, at *27 (N.D. Tex. Mar. 28, 2013) (applying harmless error analysis to the ALJ's failure to properly evaluate treating opinion under 20 C.F.R. §§ 404.1527(c)).

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected." *Mays v. Bowen*, 837 F.2d 1362, 1363–64 (5th Cir. 1988). "[E]rrors are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). In the Fifth Circuit, harmless error

exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. Nov. 28, 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)). Accordingly, to establish prejudice that warrants remand, Plaintiff must show that the ALJ's decision might have been different had she addressed or properly considered Dr. Meador's opinions regarding her functional limitations. *See id.* at 816 (citing Newton, 209 F.3d at 458).

As noted, Dr. Meador opined that Plaintiff's severe back pain made rigorous activity very painful, that tasks requiring heavy lifting or having to sit or stand for prolonged periods of time without breaks would exacerbate her condition and were harmful to the spine, that lifting or carrying objects and focusing on tasks due to chronic pain were activities that had been impaired, and that Plaintiff could no longer lift things. (doc. 14-1 at 646, 740.) As also noted, the ALJ did not address or consider these opinions from Dr. Meador. (*See id.* at 21-22.) "[S]uch an error makes it impossible to know whether the ALJ properly considered and weighed an opinion, which directly affects the RFC determination." *Kneeland*, 850 F.3d at 762. It is not inconceivable that the ALJ would have reached a different conclusion had she considered his opinions. *See id.* (stating that if the examining physician's opinions were "afforded some weight, the ALJ's RFC would surely have been different."). While it is possible that the ALJ considered and rejected Dr. Meador's opinions, there is no way of knowing because she failed to address or provide any explanation of Dr. Meador's opinions regarding Plaintiff's functional limitations. *Id.* It is unclear whether she would have adopted Dr. Meador's opinions and further limited Plaintiff's RFC, particularly since Dr. Meador opined that Plaintiff could not sit or stand for long periods of time without breaks and could no longer lift things. Even if the ALJ had considered and afforded those opinions no weight at all, it

is not the reviewing court's duty to "substitute its judgment of the facts for the ALJ's, speculate on what the ALJ could have done or would do on remand, or accept a post hoc rationalization." *See Benton v. Astrue*, No. 3:12-CV-0874-D, 2012 WL 5451819 at *8 (N.D. Tex. Nov. 8, 2012).

It is not inconceivable that the ALJ might have increased the limitations to Plaintiff's abilities to lift, carry, sit, or stand in the RFC had she considered Dr. Meador's opinions. *See McAnear v. Colvin*, No. 3:13-CV-4985-BF, 2015 WL 1378728 at *5 (N.D. Tex. Mar. 26, 2015) (finding remand was required because there was a realistic possibility of a different conclusion by the ALJ where the court was unsure of whether the ALJ considered the medical source's opinion and whether such a review would have changed the outcome of the decision). As in *Kneeland*, "[t]his, in turn, would likely have affected the jobs available at step five of the sequential evaluation process, and [Plaintiff] may have been found disabled." 850 F.3d at 762. The ALJ's error was not harmless because it is not inconceivable that she would have reached a different decision had she addressed and explained the weight given to Dr. Meador's opinions, or formally considered his opinions under 20 C.F.R. § 404.1527(c). *See Kneeland*, 850 F.3d at 761–62 (finding that the error was not harmless where the ALJ failed to address or properly consider an examining physician's opinion); *see also Singleton v. Astrue*, No. 3:11-CV-2332-BN, 2013 WL 460066 at *6 (N.D. Tex. Feb. 7, 2013) (finding the ALJ's failure to consider a medical source opinion was not harmless error because the court could not say what the ALJ would have done had he considered the opinion, and had he considered the opinion he might have reached a different decision).[6]

---

[6] Plaintiff also argues that the amount of medications she takes "evidences limitations far greater than those attributed by the ALJ." (doc. 18 at 27-28.) Because the ALJ's error in evaluating Dr. Meador's opinions necessitates remand, it is unnecessary to reach this additional argument.

## V.   CONCLUSION

The Commissioner's decision is **REVERSED**, and the case is **REMANDED** to the Commissioner for further administrative proceedings.

**SO ORDERED**, on this 18th day of March, 2019.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE